IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO
_____

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                        No. CR 98-251 MV

SHIRLEY A. JONES, MEGA-UNIVERSAL
OXYGEN AND HOME CARE SERVICES, INC.,
*et al.*,

     Defendants.


## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on Defendants' Motions for Reconsideration of Court's Ruling on Standing and for Further Consideration of Forfeiture Standard [**Motion Doc. 109; Order to be Reconsidered Doc. 102**]; Motion of Defendants Shirley A. Jones and Steven L. Jones for Release of Funds Contained in Restrained Account **[Doc. 111]**; and Report to Court on Status of Mega Assets **[Doc. 114]**. The Court, having considered the moving papers, relevant law, and being otherwise fully informed, makes the following rulings, explained in the body of this opinion.


## BACKGROUND

The relevant background of this case is more fully detailed in this Court's Memorandum Opinion and Order of April 23, 1999 **[Doc. 102]**. Briefly, at issue here is a bank account containing approximately $1,000,000, derived from the sale of the assets of Mega-Universal Oxygen and Home Care Services, Inc. ("Mega"). This account, along with various other assets, was frozen prior to trial

by a restraining order issued by this Court. Mega and Shirley and Steven Jones all seek the pre-trial release of a portion of these funds to pay for attorneys' fees and living expenses for the Joneses.

Pursuant to the Tenth Circuit opinion in this case, the Court held a hearing on April 26 and 27, 1999. Prior to the hearing, on motions of the parties, the Court had ruled that the Joneses are not entitled to seek pre-trial release of the funds contained in the bank account as these funds belong to the Mega Corporation not the Joneses, but that the Joneses could pursue pre-trial release of any funds belonging to them personally, specifically payment on two covenants not to compete with the company that purchased Mega's assets. At the beginning of the hearing on this matter, the Government indicated that it would agree to the pre-trial release of the Joneses' right to payment on these covenants. At that time, all parties believed that no payments had ever been made on these covenants. Further, all parties agree that as a result of this concession, the only remaining frozen asset which Defendants seek pre-trial access to is the corporate bank account.

At the conclusion of the hearing, the Court held that Defendants had successfully made a *prima facie* showing that at least some of the funds contained in the bank account are not seizable assets and therefore are not legally restrained. The Court further held that Shirley and Steven Jones had successfully established by a preponderance of the evidence that they had no other assets available to them for living or legal expenses, taking into consideration that no payments had been made on the now unrestrained covenants not to compete and that the possibility of payment on this obligation was uncertain. However, based on the Court's pre-hearing ruling that the Joneses could not seek pre-trial release of the funds contained in the bank account, the Court found that the Joneses were not entitled to proceed to a hearing on the seizability of the assets or otherwise pursue the release of the restrained funds. The Court further held that the Mega Corporation did have

unrestrained assets available to it in the form of a forthcoming settlement on a legal claim in the amount of approximately $22,000 (after deducting attorneys fees) and an unidentified asset found by an asset finder, estimated at $130,000. Accordingly, the Court held that neither Mega nor the Joneses were entitled to pre-trial release of the restrained funds in the bank account.

The Court, however, granted the Joneses leave to file a motion for reconsideration of the "standing issue." The Court indicated during the first hearing that if it reversed its position on the Joneses' ability to seek pre-trial release of funds belonging to the corporation, it would continue with the second hearing in this matter in which the Government must demonstrate that there is probable cause to believe that the restrained assets are forfeitable. Both the defense and the Government have filed briefs on this issue. In addition, Defendants also request that the Court reconsider and clarify the forfeiture standard regarding the corporate assets in light of the fact that Mega is not named as a defendant in the RICO counts.

In addition to the briefs regarding the "standing issue," the Court has also received Shirley and Steven Joneses' Motion for Release of Funds Contained in Restrained Account, filed May 12, 1999 **[Doc. 111]** and Report to Court on Status of Mega Assets, filed May 20, 1999 **[Doc. 114]**. In their motion, the Joneses requested release of $120,000 contained in the restrained bank account which they asserted constituted payment on the covenants not to compete. Based on representations made by Premier, the company which purchased Mega's assets and which entered into the non-compete agreements with the Joneses, the Joneses alleged that Premier had included a lump-sum payment on the covenants with its payment of the purchase price for Mega's assets. The Government contested this version of events and, when Assistant United States Attorney Mary Higgins spoke with Premier's counsel, she was told the payment had been made "by mistake." Subsequently, Premier has

once again changed its position, stating that it has not in fact paid the Joneses on the covenants not to compete. Now Premier has taken the position that it will not pay the Joneses on the covenants to compete until the parties resolve a dispute regarding certain funds paid for the purchase of Mega's assets. As a result of these developments, the issue raised in the Motion for Release of Funds Contained in Restrained Account is no longer before the Court for resolution.

Finally, in its Report to the Court, Mega states that it will soon receive approximately $22,000 from the settlement of its tort claim, but that the $130,000 asset located by the asset finder is not available. Apparently this "asset" is in fact outstanding Medicaid bills which the Mega Corporation claimed for reimbursement. The New Mexico Department of Human Services has placed a "hold" on these payments, asserting that they are fraudulent claims or that even if they are valid, the Department is entitled to offset these amounts against previously paid fraudulent claims. Thus, Mega actually has only $22,000 in unrestrained funds available to it. Mega's attorneys state that their legal bills already substantially exceed this amount.

## ANALYSIS

As an initial matter, as a result of the forgoing developments, the Court must revise several of its rulings from the April 26th and 29th hearing. Specifically, the Court finds as follows:

1. Because Mega has only $22,000 of unrestrained assets available to it and its legal fees already exceed this amount, the Court finds that Mega has established by a preponderance of the evidence that it has insufficient unrestrained funds available to it to pay for its legal expenses.

2. Because Mega does not have sufficient unrestrained funds available to it and Defendants have made a *prima facie* showing that at least some of the restrained assets are not in fact forfeitable,

4

the Court must proceed with the second hearing in this matter at which the Government has the burden of establishing probable cause to believe the restrained assets are in fact forfeitable.

3. Because Premier refuses to pay the Joneses on the covenants not to compete, the Joneses remain without unrestrained assets to provide for their living and legal expenses.

The two remaining issues raised in Defendants' briefs are: (1) the Joneses "standing" to seek pre-trial release of the restrained assets; and (2) the proper forfeiture standard in light of the fact that Mega is not a defendant in the RICO counts.

## A. The "Standing" Issue

Prior to the first hearing on this matter, the parties had briefed whether the Joneses had "standing" to seek the release of assets belonging to the corporation. In its Memorandum Opinion and Order of April 23, the Court stated that "the issue presented here is not really one of the Joneses' standing to contest the restraint of Mega's assets. . . . Rather, properly framed, the question is whether the Court can *release to Mega* restrained assets which Mega will then *release to the Joneses* to use to pay their personal legal and living expenses." Opinion, p. 5. The Court explained further:

> [i]f the Joneses were not parties to this action, they would stand in the same position as any third party claimant with regard to the corporation's funds. . . . [T]he criminal forfeiture statutes specifically provide for the adjudication of third party claims *after* the conclusion of trial and issuance of a final forfeiture order. (Citations omitted). . . . Thus, third party claimants, such as the Joneses, normally must await a jury verdict to press their claims to forfeitable assets. Does the fact that Joneses are indicted alongside of Mega and are the sole officers, directors and shareholders of the corporation, change this result? The Court concludes that it does not.

*Id*. at 6-7.

Analyzing this issue, the Court turned to the Joneses' specific claims: that they are entitled to bonuses or salary advances from the corporation and that they are entitled to indemnity by the corporation. The Court stated,

> [r]egarding the first claim, the Joneses do not assert that they have not been paid for their past work but merely that, as the sole officers and shareholders, they have an absolute right to vote themselves bonuses or advances. Regardless of the validity of this assertion (which the Government contests), the Court fails to see why the Joneses' claim for compensation from the company should be privileged over all other third party claims solely because the Joneses are indicted along side the corporation. In particular, since there are assets which belong to the Joneses personally– which may be released if the Joneses establish no other source of income– the Court is not presented with a situation where the combined pre-trial restraint of the corporation's assets and the officers' or shareholders' assets completely divests the individual defendants of a means of supporting themselves.

*Id*. at 7-8.

Turning to the Joneses' asserted right of indemnity, the Court agreed that the Joneses had been indicted, at least in part, as a result of their positions in the corporation, bringing their current legal dilemma within the scope of corporate indemnity. *Id*. at 8. However, the Court continued,

> although the Joneses are defendants in this case at least in part due to their position in the corporation, they are not entitled to vote themselves indemnity. Specifically, the controlling statute provides that only shareholders, officers or directors who are not involved in the legal proceeding may vote on the indemnity question. NMSA 1978, § 53-11-4.1(E). In a case such as this one, where there are no uninvolved individuals, the issue is to be resolved by an independent appointed counsel. *Id*. Thus, legally the Joneses cannot simply vote themselves indemnity.

*Id*. at 8-9. Further, the Court held that "even if, following legal formalities, Mega agreed to indemnify the Joneses, that does not create a right on the part of the Joneses to *pre-trial* release of the restrained funds." *Id*. at 9. Rather, the Court observed, corporate indemnity normally takes the form of reimbursement of legal fees after the legal matter is concluded, allowing the corporation to insure that all of the requirements for indemnification have been met. In light of the Government's substantial

interest in the restrained assets, the Court held that Defendants were not entitled to pursue their indemnity claims pre-trial but must wait until the resolution of this matter to press all of their third-party claims to corporate assets. *Id*.

In their Motion for Reconsideration, the Joneses point out three relevant facts not considered by the Court in its April 23rd Order. First, because Premier refuses to pay the Joneses on the covenants not to compete, the Joneses do not in fact have any unrestrained assets available to them. Thus, the Court *is* "presented with a situation where the combined pre-trial restraint of the corporation's assets and the officers' or shareholders' assets completely divests the individual defendants of a means of supporting themselves." Second, Defendants now state that they are not requesting "bonuses" or "salary advances" but outstanding payment on their salaries which they are owed. The Joneses still continue to serve as the officers of Mega, which continues to be a live corporate entity though non-operational. Throughout this litigation, the Jones have continued to manage Mega's affairs, most substantially by overseeing Mega's legal defense in this case. Yet, the Joneses have not been paid their salaries since May 1998. Thus, contrary to the Court's previous conclusion, the Joneses do "assert that they have not been paid for their past work." Third, since the first hearing on this matter, the Joneses and Mega have entered into contracts providing for indemnity and the advancement of legal fees in relation to this case. The Joneses thus assert that in addition to their statutory right of indemnity, they now have contractual rights to indemnity and, specifically, the advancement of legal fees.

Based on the forgoing, the Joneses argue that, as a result of being indicted along side of the corporation and the combined pre-trial restraint of their assets and the corporation's assets, they are without a means of supporting themselves or providing for their legal expenses. Thus, they argue, due

process requires that they be permitted to pursue their third-party contractual claims against the restrained corporate assets at this stage, prior to the trial. This result, they assert, is compelled by the Tenth Circuit opinion in this case, *United States v. Jones*, 160 F.3d 641 (10th Cir. 1998).

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *United States v. Jones*, 160 F.3d 641, 645 (10th Cir. 1998) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). As the Tenth Circuit explained in *Jones*,

> [t]o determine whether due process requires some form of a post- restraint, pre-trial hearing we consider the private interest affected by the restraint; the risk of an erroneous deprivation of that interest through the procedures used, as well as the probable value of an adversarial hearing; and the government's interest, including the administrative burden that an adversarial hearing would impose.

*Id*. (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). "Ultimately, 'due process is flexible and calls for such procedural protections as the particular situation demands.'" *Id*. at 645-46 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

In *Jones*, the Tenth Circuit held that pursuant to the Due Process Clause, Defendants in this case have a limited right to challenge the pre-trial restraint of assets. The Government had asserted on appeal that Defendants must wait until the conclusion of trial to press their claims to the restrained assets, as held by this Court regarding the Joneses' third-party claims to the corporate assets. Applying the three-factor balancing test of *Mathews v. Eldridge*, 424 U.S. 319 (1976), the Tenth Circuit rejected this contention. First, the court held that the private interests at stake– specifically Defendants' qualified Sixth Amendment right to counsel of their choice and the Joneses' interest in providing for ordinary living expenses– are important interests. *Id*. at 646 ("Defendants' qualified right to counsel of choice is an essential component of the Sixth Amendment right to counsel." "A restraining order that prevents a defendant from supporting herself and her family pending and during

trial would likely work an injustice with constitutional implications."). Second, the court found that "[t]he risk of an erroneous deprivation through the procedures afforded in section 853(e)(1)(A) is also significant. Although the statute requires a grand jury to determine that the assets are probably traceable to the underlying offense, the nature of grand jury proceedings makes that finding susceptible to error." *Id*. The court further noted that the eventual trial by jury did not eliminate the risk of erroneous deprivation as "that process often comes too late to aid a defendant where complex criminal cases can take several months or longer to proceed to trial." *Id*. Rather, the court stated, "[a]n adversarial hearing that occurs shortly after freezing assets would serve to diminish the risk of an erroneous deprivation at a meaningful time." *Id*. at 647. Turning to the third factor, the Government interest at stake, the court found that the Government's interest in preserving forfeitable assets "weighs heavily in the calculus." *Id*.

Nonetheless, the court concluded that "the proper balance of private and government interests requires a post-restraint, pre-trial hearing but only upon a properly supported motion by a defendant. Due process does not automatically require a hearing and a defendant may not simply ask for one." *Id*. Specifically, the court held that if Defendants established that they have no other unrestrained assets to pay their living expenses and that there is reason to believe the assets are not properly restrained, they may put the Government to the test of establishing probable cause for the seizure of the restrained assets prior to trial. *Id*.

Defendants argue that the holding of *Jones*, *supra*, applies with just as much force to the Joneses' third-party claims to the corporate assets. Indeed, the Government does not even contest this argument in its Response. Based on the facts as they now appear, the Court agrees with Defendants. Specifically, because the combined pre-trial restraint of the Joneses' assets and the

corporate assets has left the Joneses without a means of supporting themselves and providing for their legal expenses, the Court finds that due process requires that the Joneses be permitted to raise their third-party contractual rights to the restrained corporate assets prior to trial, provided that the Joneses can establish that they have no unrestrained assets available to them and that there is reason to believe that the restrained assets are not in fact forfeitable. *Jones*, 160 F.3d at 647. As noted above, the Court has already held that Defendants have successfully made a *prima facie* showing that the restrained assets are not forfeitable and have demonstrated by a preponderance of the evidence that they have no unrestrained assets available to them. Therefore, the Court finds that the Joneses may proceed with their third-party claims to the restrained corporate assets at this time, prior to trial.

Further, the Court finds that the Joneses are not otherwise prevented from pressing their third-party claims by the RICO forfeiture statute. As the Court noted in its previous Memorandum Opinion and Order, all of the Joneses "interest in" Mega may be forfeitable under the RICO statute. 18 U.S.C. § 1963(a)(2). Opinion, pp. 16-20. This may include not only their shares in the corporation but also their salaries and indeed their corporate positions. *Id.*; *see United States v. DeFries*, 129 F.3d 1293, 1313 (D.C. Cir. 1997) (forfeiting defendants' salary in RICO enterprise). However, as the Joneses point out, the Government has not sought pre-trial restraint of the Joneses' salaries or other interests in Mega. Thus, although these interests may eventually be found forfeitable, the Joneses currently remain free to pursue these interests and claims.

Rather than challenging the right of the Joneses to pursue their third-party claims prior to trial, the Government challenges the substance of the Joneses' third-party claims, asserting that the Joneses are not legally entitled to the corporate assets at all. First, the Government argues that the Joneses are currently in debt to the corporation by more than $750,000, and therefore, should not be

permitted to draw additional funds from the corporate accounts. Second, the Government asserts that the Joneses' newly signed contracts for indemnity and advancement of legal fees violates the statutory requirements for corporate indemnity and therefore are not enforceable contracts.

Beginning with the second point, the Joneses and Mega entered into contracts providing for indemnification and the advancement of legal fees in relation to this case on May 7, 1999, after the first hearing on this matter. The Government does not here argue that the indemnity contracts were not entered into according to the required corporate formalities and the Court's own review of the documents indicates that the contracts appear to have been adopted in full accordance with the corporate by-laws. Rather, the Government argues that by entering into contracts for indemnity, the Joneses are circumventing the statutory prohibition against interested shareholders and directors voting on the indemnity issue. *See* NMSA 1978, § 53-11-4.1(E). Specifically, the corporate by-laws permitted each of the Joneses to vote on the indemnity contract of the other and, since there are no other shareholders in the corporation, the result was that each of the Joneses cast the sole controlling vote on this issue, effectively by-passing the Court's observation that pursuant to the New Mexico indemnity statute, the Joneses could not simply vote themselves indemnity because they were both interested parties in this proceeding.

The Joneses respond first that Steven Jones is not an interested party on the issue of the indemnity of Shirley Jones and vice versa. This argument may be quickly rejected. Not only are the Joneses co-defendants in this case, they are also husband and wife. Each plainly has an interest in the indemnity of the other, if for no other reason than because they are legally responsible for each other's expenses. Thus, the argument that the Joneses are not interested in each other's indemnification is simply untenable.

Second, Defendants argue that the New Mexico indemnification statute is not exclusive, but provides, in pertinent part, that "[t]he indemnification authorized by this section shall not be deemed exclusive of any other rights to which those seeking indemnification may be entitled under the articles of incorporation, the bylaws, an agreement, a resolution of shareholders or directors or otherwise . . . ." NMSA 1978, § 53-11-4.1(G). This provision, the Joneses assert, permits Mega to enter into the current indemnity contracts with the Joneses, even if the result is that the Joneses may grant each other corporate indemnity effectively by fiat, by passing the procedural safeguards contained in the indemnity statute. Further, Defendants correctly note that the Government has failed to cite any authority to support its proposition that the indemnity contracts are not enforceable because they conflict with the New Mexico indemnity statute.

Neither party discusses the leading case (indeed practically the only case) to address the scope of a "non-exclusivity" provision in a state indemnity statute, *Waltuch v. Conticommodity Services, Inc.*, 88 F.3d 87 (2nd Cir. 1996). *See also* Block and Radin, Indemnification and Insurance of Corporate Officials, 1023 PLI/ Corp 803, 861-66 (1997); Rosen, Permissible Scope of Indemnification of Corporate Officers and Directors Under Delaware Law, 10 No. 11 INSTI 21, 21-22 (1996); Ferrara, Shareholder Derivative Litigation: Besieging the Board, SDLBTB § 12.07 (1996). In *Waltuch*, the Second Circuit addressed whether a corporate director was entitled to indemnity pursuant to the corporation's articles of incorporation, despite the fact that he could not establish that he had acted in good faith. The corporation resisted, arguing that the Delaware indemnity statute limited corporate indemnity to situations in which the director had acted in good faith. The corporate officer responded that notwithstanding the "good faith" requirement of the statute, he was entitled to indemnity under the articles of incorporation as a result of the "non-

exclusivity" provision of the Delaware statute which, in language similar to that of the New Mexico statute quoted above, provided that statutory indemnification was "not exclusive of" indemnification provided by corporate charter or contract. *Waltuch*, 88 F.3d at 89.

In analyzing this issue, the Second Circuit observed that although "non-exclusivity clauses" are common provisions in state indemnity statutes, they have been the subject of almost no published decisions. *Id.* at 91; *see also* Block and Radin, Indemnification and Insurance, 1023 PLI/ Corp at 861; Rosen, Permissible Scope of Indemnification, 10 No. 11 INSTI at 21; Ferrara, Shareholder Derivative Litigation, SDLBTB § 12.07. However, reviewing in detail numerous commentators' opinions on the issue, the court found that "it has been generally agreed that there are public policy limits on indemnification" under non-exclusivity provisions. *Waltuch* 88 F.3d at 91. Thus, the court held that "a corporation's grant of indemnification rights cannot be inconsistent with the substantive statutory provisions of [the state indemnification statute], notwithstanding [the non-exclusivity provision]." *Id.* The court then held in the case before it that the corporate officer was not entitled to indemnity unless he could establish that he acted in good faith, as required elsewhere in the indemnity statute, even if he sought indemnity through a corporate charter rather than under the indemnification statute. *Id.* at 93.

This interpretation, the court observed, was the only reading which made sense of the statute as a whole. Quoting with approval the district court judge, the Second Circuit stated,

> there would be no point to the carefully crafted provisions of [the indemnity statute] spelling out the permissible scope of indemnification under Delaware law if [the non-exclusivity provision] allowed indemnification in additional circumstances without regard to these limits. The exception would swallow the rule.

*Id.* at 91. On the other hand, the court noted, the fact that the other provisions of the statute limited the scope of the non-exclusivity provision did not render this provision meaningless as the provision "still may authorize the adoption of various procedures and presumptions to make the process of indemnification more favorable to the indemnitee without violating the statute." *Id.* at 91, 94. For example, a corporation could agree to mandatory advancement of legal fees, rather than merely the permissive advancement of legal fees provided by both the Delaware and the New Mexico indemnification statutes. *See Id.* at 94; *see also* NMSA 1978, § § 53-11-4.1(F).

*Waltuch* thus held that any indemnity agreement entered into under the non-exclusivity provision of the Delaware indemnity statute must be consistent with the substantive requirements for indemnity elsewhere in the statute. The broader principal, that public policy limits indemnification agreements entered into under non-exclusivity provisions of indemnity statutes, has been endorsed by numerous commentators both before and after *Waltuch. See Waltuch*, 88 F.3d at 94; Block and Radin, Indemnification and Insurance, 1023 PLI/ Corp at 863 ("There is general agreement that non-exclusivity provisions are subject to at least some public policy limitations, particularly with respect to indemnification otherwise expressly prohibited by the governing indemnification statute."); Ferrara, Shareholder Derivative Litigation, SDLBTB § 12.07. However, all commentators agree that the scope of the public policy limits on indemnification agreements is undecided. Block and Radin, Indemnification and Insurance, 1023 PLI/ Corp at 866; Ferrara, Shareholder Derivative Litigation, SDLBTB § 12.07.

In the present case, the Joneses have not attempted to circumvent the substantive provisions of the New Mexico indemnity statute. The indemnity contracts they have entered into with Mega mirror the requirements for indemnity under the statute and provide that the advanced funds must be

returned if the ultimate facts demonstrate that they were not entitled to indemnity. However, the Joneses entered into these indemnity contracts in an attempt to by-pass the statutory prohibition against interested shareholders voting on the indemnity issue. Thus, the question before the Court is whether public policy requires that an indemnification agreement entered into pursuant to the non-exclusivity provision of the New Mexico indemnity statute must adhere to the procedural safeguards contained in that statute to be enforceable. This specific question is an issue of first impression.

The Joneses argue that the purpose of the procedural safeguards is to protect the rights of minority shareholders by ensuring that majority stockholders do not abuse their power by voting themselves indemnity. While protection of minority shareholders is no doubt one purpose behind these limitations, it need not be the only purpose. Rather, it is logical to infer that the statute intends to protect the interests of anyone who may have a claim or stake in the corporate affairs but who is not represented in the corporate governing body. In the present case, the Government fits this description. Although the Government is not a shareholder, it is a stakeholder, claiming that it holds legal title to all of the corporate assets. Enforcement of the contracts at issue here would not simply be "victimless," as Defendants essentially argue, but would add an additional encumbrance to assets which may belong to the Government. Moreover, to conclude that the Joneses may simply enter into indemnity contracts with the corporation by virtue of their own voting power as shareholders would effectively nullify the provisions of the New Mexico indemnity statute which prohibit interested shareholders from voting on the indemnity issue. As the *Waltuch* court observed, "[t]he exception would swallow the rule." 88 F.3d at 91.

Accordingly, pursuant to the persuasive authority of *Waltuch*, the Court finds that public policy prohibits the enforcement of these indemnification contracts as they were entered into in

violation of the New Mexico statutory prohibition against interested shareholders and directors voting on the indemnity issue. Based on this holding, the Court will not permit the Joneses to pursue payment under the indemnity contracts at this time. However, the Joneses remain contractually entitled to payment of their salaries as officers of the corporation. Thus, the Joneses may continue to pursue pre-trial release of the corporate funds, even if they have not demonstrated a statutory or contractual right to indemnity.

Accordingly, the Court now turns to the Government's remaining argument against the Joneses' pre-trial access to the corporate funds: that the Joneses may not collect on their outstanding salaries because the corporate books indicate that the Joneses currently owe the corporation more than $750,000. According to the Government, whenever the Mega accountants encountered an expense that they could not readily identify as related to the business, the expense was noted as personal and added to an ongoing, revolving debt account which the Joneses maintained with Mega. Some of these expenses were later identified as legitimate corporate expenses and removed from that account, but other expenses were never officially allocated as either personal or business. As a result, although the books reflect a debt in the amount of $750,000, the Government acknowledges that this figure may not be accurate. Nevertheless, the Government argues that the Joneses should not be permitted to draw additional funds from the corporate account while they are in debt to the corporation in the amount of several hundred thousand dollars. The Joneses respond that they are entitled to their salaries regardless of any debt they may owe to the company.

The Court finds the Government's argument persuasive, in theory. Although the Court has held that the Joneses may press their third-party claims to corporate funds now, prior to trial, the Joneses may only access those funds if they are legitimately entitled to them. If the Joneses are in fact

in debt to Mega, then the Joneses' claim that the corporation owes them money (in the form of their outstanding salaries) must fail. Other than by virtue of their third-party claims, the Joneses have no right to access the corporate funds at this stage. If the Joneses third-party claims lack evidentiary support, then the Joneses have no right to access the corporate funds at all.

In this vein, the Court finds that an evidentiary hearing on this issue is necessary. The Court currently has before it only the Government's presumably good faith assertion regarding the corporate books. Before the Court is prepared to conclude that the Joneses may not collect on their salaries because they remain in debt to the corporation, the Court must have a proper evidentiary foundation. Thus, at the next hearing on this matter, the parties will be expected to present evidence on this issue. Pursuant to 18 U.S.C. § 1963(l)(6) – the provision of the RICO statute regarding adjudication of third-party claims – it is the Joneses' burden to establish by a preponderance of the evidence that the corporation in fact owes them money and how much. However, the Joneses have already established to the Court's satisfaction that they have continuing contractual rights to their salaries in the amount of $150,000, per year for Shirley Jones and $75,000, per year for Steven Jones. Since the Government here challenges the legitimacy of these claims, the Court will require the Government to present evidence tending to demonstrate that the Joneses are in fact in debt to the corporation in sums larger than their outstanding salaries. The ultimate burden of persuasion will remain on the Joneses to demonstrate that there are entitled to collect on their salaries.

In sum, the Court finds that: (1) the Joneses have a due process right to pursue their third-party claims to corporate assets now, prior to trial; (2) because these interests are not the subject of pre-trial restraint, the Joneses are not prevented by the RICO statute from pursuing these claims now, prior to trial, even if these claims are ultimately forfeited under the statute; (3) the indemnity contracts

between the Joneses and Mega are unenforceable as a matter of public policy though the Joneses have contractual rights to their salaries which they may continue to press; (4) the Joneses may not collect additional funds from Mega as payment on their salaries unless they establish by a preponderance of the evidence that the corporation owes them money, rather than the reverse; and (5) the Government must produce evidence tending to demonstrate that the Joneses are in debt to the corporation though the ultimate burden of persuasion regarding the third-party claims lies with the Joneses.

### B.  The Forfeiture Standard

Next, the parties dispute what standard the Court should use in determining whether the corporation's assets are forfeitable. In its previous Memorandum Opinion and Order, the Court held that under the RICO forfeiture statute, the "but-for" standard controls the determination of whether the frozen assets are in fact forfeitable. Opinion at 17. Defendants now bring to the Court's attention that Mega is not named as a defendant in the RICO counts. As a result, Defendants argue, *Mega's assets* are only forfeitable under the health care fraud statute, 18 U.S.C. § 982(a)(6), not the RICO statute, even if the assets of the Joneses personally (including their interest in Mega) are forfeitable under the latter statute. The Government responds first, that because Mega is named as the illegal enterprise in the RICO counts, all of its assets are forfeitable under that statute, and second, that because all of the Joneses' interest in Mega may be forfeitable, the corporation's assets are properly frozen under the RICO forfeiture provisions.

The health care fraud statute provides that "[t]he court, in imposing sentence on a person convicted of a Federal health care offense, *shall order the person to forfeit* property, real or personal,

that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission

of the offense." 18 U.S.C. § 982(a)(6) (emphasis added). The RICO forfeiture statute likewise states:

> **(a)** *Whoever* violates any provision of section 1962 of this chapter . . . *shall forfeit* to the United States, irrespective of any provision of State law--
>
> **(1)** *any interest the person has acquired or maintained* in violation of section 1962;
>
> **(2)** any--
>
>> **(A)** interest in;
>>
>> **(B)** security of;
>>
>> **(C)** claim against;  or
>>
>> **(D)** property or contractual right of any kind affording a source of influence over;
>
> any enterprise *which the person has established*, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962; and
>
> **(3)** any property constituting, or derived from, any proceeds *which the person obtained*, directly or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962.

18 U.S.C. 1963(a) (emphasis added). As the Court noted in its previous opinion, "[f]orfeiture under

the health care fraud statute is narrowly targeted at property derived directly or indirectly from the

illegal acts. . . . [T]he RICO forfeiture [provisions] also target property derived from the RICO

violations but reach a potentially broader range of assets."  Opinion at 16; *see also Russello v. United*

*States*, 464 U.S. 16, 24 (1983); *United States v. Nichols*, 841 F.2d 1485, 1487 (10th Cir. 1988).

Yet, as the emphasized language makes clear, both statutes are limited to forfeiting the

interest or property of the *person convicted* of violating the statute. Criminal forfeiture provisions

such as these are intended to punish the convicted person by depriving her of her illegally gotten gain.

*Russello*, 464 U.S. at 28; *Nichols*, 841 F.2d at 1487. Unlike civil forfeiture statutes however, criminal

forfeiture statutes do not provide for the forfeiture of all of the "tainted property." Rather, it is only the convicted defendant's interest which is forfeited. *Russello*, 464 U.S. at 28; *Nichols*, 841 F.2d at 1487; *United States v. Busher*, 817 F.2d 1409, 1413 (9th Cir.1987); *United States v. Cauble*, 706 F.2d 1322, 1349-50 (5th Cir.1983), cert. denied, 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984). As the Ninth Circuit recently explained,

> [t]he problem of forfeiture of an entire enterprise is essentially limited to the situation where the convicted defendant owns substantially all of the stock of a corporation, or where the enterprise is a sole proprietorship. This is so because under section 1963 only the defendant's interest in the enterprise is forfeitable, not the enterprise itself. . . . Thus, only where the culpable person owns the entire enterprise will it be subject to complete forfeiture for violation of RICO.

*Busher*, 817 F.2d at 1413.

Thus, the Government's contention that all of Mega's assets are forfeitable under the RICO statute because it is named as the illegal enterprise in the RICO counts must be rejected. *Id*. Only the Joneses' interests in Mega are forfeitable under the RICO counts, and therefore under the but-for standard as discussed in the Court's previous Opinion, *Mega's assets* will only be forfeitable if *Mega* is convicted of health care fraud. Accordingly, Defendants are correct that the forfeiture standard of the health care fraud statute must be used in assessing the forfeitability of the corporate assets.

The Government points out that this case presents the rare circumstance discussed in *Busher, supra*, in which all of the corporation may ultimately be forfeited to the Government. Because the Joneses are the sole shareholders of Mega, the effect of forfeiting all of their interest in the corporation will in fact be to forfeit to the Government all interest in Mega. The Government argues that therefore the Court should apply the RICO but-for standard to assess the forfeitability of all of the assets, including the corporate assets.

The Government is here essentially attempting to achieve indirectly what it has failed to do directly: that is, freeze the Joneses interest in the Mega corporation. As noted above, the Government has not sought any pre-trial restraint of the Joneses' interest in Mega, either in the form of their salaries or their control over the corporation as directors and as the sole shareholders. Rather, the Government has directly restrained only the corporation's assets. In addition, throughout this litigation, the Government has emphasized the distinction between Mega's right of access to its corporate funds and the Joneses' right of access to those funds. Now the Government attempts to collapse the Joneses' forfeitable interest in the corporation with the corporation's forfeitable interest in the corporate assets. This the Court cannot do. Even if the Government ultimately becomes the actual owner of all of the corporate assets through forfeiture of the Joneses' interest in the corporation, the corporate assets are directly forfeitable, if at all, only under the health care fraud statute. Accordingly, the Court will apply the standard of "derived, directly or indirectly, from gross proceeds traceable to the commission of the offense," to determine if the corporate assets in the frozen bank account are in fact forfeitable. 18 U.S.C. § 982(a)(6).

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' Motions for Reconsideration of Court's Ruling on Standing and for Further Consideration of Forfeiture Standard [**Motion Doc. 109**] is hereby **GRANTED**; and Motion of Defendants Shirley A. Jones and Steven L. Jones for Release of Funds Contained in Restrained Account **[Doc. 111]** is hereby **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that:

1.  Because Mega has only $22,000 of unrestrained assets available to it and its legal fees already exceed this amount, the Court finds that Mega has established by a preponderance of the evidence that it has insufficient unrestrained funds available to it to pay for its legal expenses.

2.  Because Mega does not have sufficient unrestrained funds available to it and Defendants have made a *prima facie* showing that at least some of the restrained assets are not in fact forfeitable, the Court must proceed with the second hearing in this matter at which the Government has the burden of establishing probable cause to believe the restrained assets are in fact forfeitable.

3.  Because Premier refuses to pay the Joneses on the covenants not to compete, the Joneses remain without unrestrained assets to provide for their living and legal expenses.

4.  The Joneses have a due process right to pursue their third-party claims to corporate assets now, prior to trial.

5.  Because the Joneses' interests in the corporate assets are not the subject of pre-trial restraint, the Joneses are not prevented by the RICO statute from pursuing these claims now, prior to trial, even if these claims are ultimately forfeited under the statute.

6.  The indemnity contracts between the Joneses and Mega are unenforceable as a matter of public policy though the Joneses have contractual rights to their salaries which they may continue to press.

7.  The Joneses may not collect additional funds from Mega as payment on their salaries unless they establish by a preponderance of the evidence that the corporation owes them money, rather than the reverse.

8. The Government must produce evidence tending to demonstrate that the Joneses are in debt to the corporation though the ultimate burden of persuasion regarding the third-party claims lies with the Joneses.

9. The forfeiture standard of the health care fraud statute– whether the funds were "derived, directly or indirectly, from gross proceeds traceable to the commission of the offense,"-- controls the assessment of the forfeitability of the corporate assets contained in the frozen bank account.

_____
MARTHA VÁZQUEZ
U. S. DISTRICT JUDGE

Attorney for Plaintiff:
     Mary Higgins

Attorney for Defendants:
     Nancy Hollander
     John Cline
     Louis Stelzner
     Richard Minzner