IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                                                                                                                       No. CR 98-251 MV

SHIRLEY A. JONES, MEGA-UNIVERSAL
OXYGEN AND HOME CARE SERVICES, INC.,
*et al.*,

    Defendants.

## **MEMORANDUM OPINION AND ORDER**

**THIS MATTER** is before the Court on Defendants' Motions for a *Monsanto* Hearing and Release of Seized Funds and related post-hearing submissions of the parties **[Docs. 4, 134, 135, 137, 138, 139, 140]**; Motion of Defendants Shirley A. Jones and Steven L. Jones for Court to Consider the Government's Prior Statements About Mega's Expenses as Admissions **[Doc. 125]**; and Motion of Defendants Shirley A. Jones and Steven L. Jones for Court to Certify Issue to New Mexico Supreme Court **[Doc. 130]**. The Court, having held two evidentiary hearings and having considered the moving papers, relevant law, and being otherwise fully informed, finds that the Government has failed to establish probable cause to conclude that the restrained assets are forfeitable and that the restraining order must be dissolved. The Court further finds that, as a result of this ruling, the other matters raised by the parties are moot or not properly before the Court.

## BACKGROUND

The relevant background of this case is more fully detailed in this Court's Memorandum Opinion and Order of April 23, 1999 **[Doc. 102]**. Briefly, at issue here is a bank account containing approximately $1,000,000, derived from the sale of the assets of Mega-Universal Oxygen and Home Care Services, Inc. ("Mega"). This account, along with other assets, was frozen prior to trial by a restraining order issued by this Court **[Doc. 24]**. Mega and Shirley and Steven Jones all seek the pre-trial release of a portion of these funds to pay for attorneys' fees and living expenses for the Joneses.

Pursuant to the Tenth Circuit opinion in this case, the Court held part one of a two part hearing on April 26 and 27, 1999. Prior to the hearing, the Court ruled that the Joneses were not entitled to seek pre-trial release of the Mega funds contained in the restrained bank account, but could only seek the release of assets which belonged to them personally, specifically, their rights to payment on two covenants not to compete. At the beginning of the hearing, the Government indicated that it would release the covenants not to compete from the restraining order, leaving only the funds in the restrained bank account at issue. At the conclusion of the hearing, the Court held that Defendants had successfully established a *prima facie* case that at least some of the funds contained in the bank account are not forfeitable assets and therefore are not legally restrained. The Court further held that Shirley and Steven Jones had successfully established by a preponderance of the evidence that they had no other assets available to them for living or legal expenses. However, based on the Court's pre-hearing ruling that the Joneses could not seek pre-trial release of the funds contained in the bank account, the Court found that the Joneses were not entitled to proceed to a hearing on the seizability of the assets or otherwise pursue the release of the restrained funds. The Court further held that the Mega Corporation did have unrestrained assets available to it in the form of a forthcoming settlement

2

on a legal claim in the amount of approximately $22,000 and an unidentified asset found by an asset finder, estimated at $130,000. Accordingly, the Court held that neither Mega nor the Joneses were entitled to pre-trial release of the restrained funds in the bank account.

The Court, however, reconsidered these ruling on motions of Defendants. On reconsideration, the Court found that the Joneses have a due process right to assert their third-party interest in the restrained corporate assets prior to trial. In addition, the Court found that the Joneses would not actually receive payment on the covenants not to compete in the foreseeable future, leaving them without any unrestrained assets. Further, the Court found that the Joneses did have legitimate interests in unpaid salaries which could be raised pre-trial, though the Court concluded that the Joneses could not enforce contracts for indemnification with Mega which they entered into following the first evidentiary hearing. But, the Court also concluded that if the Joneses were in fact indebted to the corporation, then they could not collect payment on their outstanding salaries. Finally, the Court found that Mega in fact had only $22,000 in unrestrained assets available to it, a sum which falls below the corporation's outstanding legal fees. Accordingly, the Court concluded that both Mega and the Joneses were entitled to proceed to the second stage of the evidentiary hearing in which the Government would be required to establish probable cause to believe that the restrained assets are forfeitable and the Joneses would be required to establish that Mega owed them money, rather than the reverse. The Court also ruled that the forfeiture standard of the health care fraud statute, rather than that of the RICO statute, would govern the forfeitability of Mega's assets.

The Court conducted the second hearing on June 24, 25 and 28, 1999. Following the hearing, the parties submitted stipulated proposed findings of fact, and each side submitted their own proposed findings of facts and conclusions of law and legal briefs. In the interim, the Joneses also filed two

3

additional motions, one seeking to hold the Government to certain representations and one requesting this Court to refer the issue of the enforcability of the indemnification contracts to the New Mexico Supreme Court. The Government has also requested reconsideration of the Court's ruling that the health care forfeiture statue governs the forfeitability of Mega's assets rather than the RICO forfeiture statute. All of these matters are currently pending before the Court.

## FINDINGS OF FACTS

Having reviewed the evidence presented at the second hearing and the moving papers, the Court makes the following findings of facts:

1. Mega-Universal Oxygen and Home Care Services, Inc., is a New Mexico corporation, incorporated in 1989.

2. Shirley and Steven Jones are the sole shareholders and directors of Mega. Shirley Jones is the President of Mega and Steven Jones is the Vice-President.

3. Defendants Shirley and Steven Jones are charged in Count 1 of the indictment with conducting the affairs of Mega, which is identified as the criminal enterprise, through a pattern of racketeering activity, in violation of 18 U.S.C. §1962(c). The acts identified as the racketeering activities are wire fraud and money laundering.

4. Defendants Shirley and Steven Jones and Mega are charged in Counts 2 through 204 with wire fraud and health care fraud, in violation of 18 U.S.C. §§ 2, 1343, and 1347.

5. For the purposes of this motion, the Court must assume that there is probable cause to believe that Defendants committed the acts charged.

6. By 1997, Mega had storefronts in Las Vegas, Española, Kirtland, Crownpoint, Cuba and Albuquerque, with its corporate offices located in Albuquerque.

7. Mega was in the business of providing oxygen, durable medical equipment ("DME"), and related services to patients in their home.

8. Mega was an authorized provider of oxygen and DME services with the New Mexico Medicaid ("Medicaid") program, and as such could submit claims for payment to the program.

9. Medicaid regulations require a current doctor's prescription for any services charged to the program.

10. The Government calculated the fraudulent amount alleged in this case by totaling all of the bills for oxygen (code EO443) submitted by Mega to Medicaid for which the patient did not have a current prescription for oxygen, in violation of Medicaid regulations.

11. The Government also verified with several patients that they did not in fact receive the oxygen billed for.

12. In determining whether any particular EO443 claim was fraudulent, claims based on any kind of oxygen-related services were deemed legitimate if there was any indication in the medical files or Mega's patient files that oxygen in any form had been prescribed to a patient.

13. The Government does not contend for purposes of this hearing that any of Mega's receipts obtained during 1993 were fraudulent. Mega made a gross profit of $90,349 in 1993. Mega showed a loss on its 1993 tax return because it remained in debt by more than $400,000.

14. During the period 1994 through 1997, Mega's total income from all sources was $26,302,470.

15. For purposes of this hearing, the Government contends that Mega received $16,859,771 during the period 1994 through 1997 as the result of Medicaid fraud. This amount represents 64.1% of Mega's total receipts during this period. Specifically, the Government alleges the following fraudulent amounts:

    a. For 1994, $1,110,523.05;

    b. For 1995, $2,731,089.59;

    c. For 1996, $6,827,528.79; and

    d. For 1997, $6,190,629.97.

16. During the period 1994 through 1997, Mega received $9,442,699 which the Government does not contend is fraudulent for purposes of this hearing. This amount represents 35.9% of Mega's total receipts during this period.

17. Mega's actual out of pocket expenses for the period 1994 through 1997 were between $6 million and $15 million.

18. Mega's unchallenged income for each of the years 1994 through 1997 was insufficient to meet its actual out of pocket expenses for those years.

19. In November 1997, federal agents executed search warrants at Mega's offices. Following the execution of the search warrants, the Government obtained a temporary restraining order freezing Mega's assets.

20. Following the indictment, Medicaid stopped making payments to Mega, though Mega continued providing service to approximately 65 Medicaid patients.

21. After Medicaid stopped paying, Mega's total monthly income declined from nearly $1 million per month to approximately $75,000 to $100,000 per month.

22. In December 1997, the Court appointed John Emery of Growth Dynamics, LLC, to administer Mega.

23. On March 6, 1998, Mega sold its assets to Premier Medical, Inc./ Ro-Tech, ("Premier") for $1.5 million.

24. If Mega had not closed the sale on March 6, 1998, it would have run out of operating funds the next day and would have been forced out of business.

25. The assets sold to Premier consisted of a verified patient list, of 430 to 440 patients, and certain hard assets such as vehicles and durable medical equipment.

26. Prior to the sale, John Emory and Growth Dynamics, LLC, verified that each patient on the list did in fact have a prescription for the services provided and was actually receiving the services.

27. The purchase price for Mega's assets was based on the patient list. The patient list was priced at approximately $3,500 per patient. This price reflected certain hard assets which were expected to accompany the number of patients on the list.

28. All of Mega's hard assets standing alone were valued at approximately $75,000 to $100,000, and were not considered significant in the negotiations over the purchase price. In fact, Mega had excess hard assets which Premier did not wish to acquire.

29. In addition to the $1.5 million, Premier agreed to pay the Jones $1000 each per month for five years for covenants not to compete. This amount was also in consideration for the "excess" hard assets, such as vehicles, which Premier acquired in the transaction.

30. The Court entered a Protective Order on April 30, 1998, restraining: (a) the proceeds from the sale of Mega's assets to Premier, contained in Bank of America account numbers

2022434948 and 2022634829 (presently containing approximately $1,000,000.00 in United States currency); (b) all the rights of Mega, Shirley Jones and Steven Jones to the contents of the escrow accounts established by Mega and Premier in the sales agreement in the approximate amount of $500,000; and (c) all the rights of Mega, Shirley Jones, and Steven Jones to payments from Premier for a covenant not to compete with Premier, in the approximate amount of $2,000 per month for a period of five years [**Doc. 24**].

31. The Government presented no evidence tracing the funds that it alleges Mega received through fraud to the assets that Mega sold to Premier.

32. The Government presented no evidence that the patient list and associated hard assets would have brought a lower price if sold during the period 1994 through 1997 than they did when sold in 1998.

33. The Government presented no evidence that Mega acquired the patients on the patient list in 1998 as a result of the fraud, nor that Mega was able to maintain patients on the patient list as a result of the fraud.

## ANALYSIS

As has been the case through out the course of this litigation, the parties have raised numerous complicated legal issues in the various briefs before the Court. Turning to the central issue in dispute, the Court finds that the Government has failed to establish probable cause to conclude that the restrained assets are forfeitable. Further, the Court finds that as a consequences of this ruling, the Court must lift the restraining order currently in place, but that the Court has no authority to affirmatively order the release of funds from the account, irrespective of any other liens which may

be in place. Finally, the Court finds that, as a result of this ruling, the other issues raised in the parties' motions are either moot or not properly before the Court.

### A. Probable Cause to Restrain Assets

The Government's theory as to why the assets contained in the frozen bank account are forfeitable is as follows: Mega was not a viable corporate entity between 1994 and 1997. The corporation earned a legitimate profit only once, in 1993, and even then remained "in the red" as it was in debt by more than $400,000 at the time. Although Mega brought in approximately $9 million in legitimate (or uncontested) income between 1994 and 1997, the corporation's actual expenditures far exceeded its legitimate income. Thus, in the absence of the illegally obtained funds, Mega would have failed as a corporation sometime prior to the 1998 sale to Premier. Therefore, because the proceeds of the illegal activity were necessary to keep the corporation alive, the proceeds of the assets eventually sold are "traceable indirectly" to the health care fraud. Alternatively, because the corporation would not have still been in existence in 1998 "but for" the illegal activity, the proceeds from the sale of the corporate assets are seizable.

Even if the Court were to accept the basic premises of the Government's argument, and even if the Court were to apply the more wide-reaching "but for" forfeiture standard, the Court would have to conclude that the Government has failed to prove its case. The problem is this: Even if the Court accepts that Mega would have failed as a corporate entity sometime prior to the 1998 sale, there is absolutely no evidence in the record as to whether the assets sold in 1998 were available and would have sold for more or less in prior years. All parties agree that the primary asset sold when the corporation did fail in 1998 was the patient list and accompanying hard assets. What the Government has failed to do is provide any evidence whatsoever that these legitimate patients were acquired or

9

maintained as a result of the illegal activity. It is possible to imagine that Mega was able to increase its patient list as a direct result of its illegal activity, such as by being able to maintain branch offices throughout the state to recruit new patients. But this is mere speculation; there is no evidence in the record on this point. The Court does not know how many legitimate patients Mega had in 1993, prior to the initiation of the illegal activity, nor how much this patient list would have fetched at any time between 1994 and 1997. As far as the Court knows, the legitimate patients "sold" in 1998 were maintained by Mega from before the initiation of the illegal conduct. To state the matter another way, the Government has not proven that the patient list did not predate the illegal conduct or that the patients would not have stayed with Mega until its collapse, whenever that came, in the absence of the illegal conduct. Thus, there is no evidence demonstrating that the asset actually sold– the patient list– was traceable to (directly or indirectly), acquired or maintained as a result of the illegal activity.

In this regard, the Court finds instructive two cases which it cited in its first Memorandum Opinion and Order on these issues, *United States v. DeFries*, 129 F.3d 1293, 1313 (D.C. Cir. 1997), and *United States v. Angiulo*, 897 F.2d 1169, 1213 (1st Cir.1990). In *DeFries*, a case alleging ballot tampering by union officials, the Seventh Circuit upheld the forfeiture of defendants' salaries on the grounds that the government had shown that "but for" the election, all of which was tainted by the illegal activity, defendants would not have received their salaries. *DeFries*, 129 F.3d at 1313. On the other hand, the First Circuit in *Angiulo* reversed an order of forfeiture where the boats at issue had been acquired prior to the commission of both predicate acts which formed the basis for the underlying RICO conviction, concluding that the government failed to met the but-for test. *Angiulo*, 897 F.2d at 1213-14. Likewise, in the present case, the Government has failed to establish that the

asset actually sold, the patient list, was acquired after the initiation of the illegal conduct or, alternatively, that the patient list would not have been available for sale absent the illegal acts.

In the absence of such evidence, the only way the Court could accept the Government's theory of forfeitability would be if the Court assumed that Mega would have collapsed as a corporate entity without selling off its patient list. The Court finds no evidentiary basis for making such an assumption. Indeed, when Mega did ultimately fail in 1998, after its fraudulent income was halted, as the Government predicts would have occurred earlier, the corporation was able to sell the patient list for $1.5 million, even given wide media coverage that the corporation had been indicted. The Court finds no basis for assuming that Mega would not have also been able to sell its patient list if it failed at an earlier date, particularly in the absence of such negative media coverage.

Thus, the Court finds that the Government has failed to establish probable cause to conclude that the funds contained in the Mega corporate bank accounts are forfeitable. Moreover, since the only other remaining asset named in the current restraining order (the $500,000 escrow account) is also part of the proceeds from the sale of Mega's assets to Premier, the Court finds that the Government has failed to establish probable cause to restrain this asset as well.

As the Government correctly points out, in the absence of probable cause to believe the funds are forfeitable, they cannot be subject to pre-trial restraint by this Court in any fashion. *See* 18 U.S.C. §1963(d); 21 U.S.C. § 853(e). Defendants contend that, rather than simply lifting the restraining order, the Court may maintain control of the bank accounts but order the release of certain requested funds. Defendants make this argument in an attempt to circumvent the IRS lien on the bank account. However, Defendants have not provided and the Court has not found any authority for this proposition. The forfeiture statutes permit pre-trial restraint of assets only on a showing of probable

11

cause to conclude that the funds are forfeitable. *See* 18 U.S.C. §1963(d); 21 U.S.C. § 853(e). In the absence of probable cause, this Court may not restrain the funds in any manner. Nor may the Court vindicate the funds from other legal restraints not before this Court. The IRS lien is a civil matter which Defendants will have to contest through whatever channels are available, just as they would if a private individual maintained a valid lien on the account. This Court may not simply release the funds because Defendants need them. All this Court can and will do is dissolve the improper restraining order. Accordingly, the restraining order will be lifted as to all the named assets.

### B. Joneses' Interest in the Corporate Assets

Given that the Court must release the Mega funds from pre-trial restraint, it need not decide whether the Joneses have legitimate claims to those funds. As far as the Court is concerned, the funds now lie solely in the hands of the Mega corporation, which may do with them whatever it pleases. This includes paying the Joneses their past due salaries even if the Joneses remain in debt to the company, paying the Joneses bonuses, paying Mega's attorney's fees and even indemnifying the Joneses for their current legal fees.

In an attempt to avoid this result, the Government indicates in its post-hearing memorandum that, in the event the Court lifts the restraining order, the Government "will ask the Court to amend the present Protective Order to include restraint of the Joneses' interest in Mega's assets." *See* Government's Memorandum at p. 11; *see also* 18 U.S.C. § 1963(a) (providing for forfeiture of, among other things, "any interest . . . in any enterprise which the person has established, operated, controlled, conducted, or participated in the conduct of, in violation of" RICO). For reasons unknown to the Court, the Government does not in fact ask for the pre-trial restraint of the Joneses' interest in Mega. Yet, the RICO forfeiture provision specifically states that the Court may restrain assets pre-

12

trial only "[u]pon application of the United States . . . ." 18 U.S.C. § 1963(d)(1). Since no such application is currently before the Court, the Court cannot address this issue.

### C. Remaining Motions

Based on the forgoing, the Court concludes that the Joneses' Motion for Court to Consider the Government's Prior Statements About Mega's Expenses as Admissions **[Doc. 125]** and Motion for Court to Certify Issue to New Mexico Supreme Court **[Doc. 130]** are moot. With regard to the first motion, the Court finds that whether Mega's expenses for 1994 to 1997 are set at the higher or lower estimate is irrelevant to its probable cause determination, as discussed above. With regard to the second motion, the Court finds that, as of now, the question of whether it is appropriate for Mega to indemnify the Joneses, either under the contracts or statute, is an issue for the Joneses and Mega to resolve amongst themselves. In addition, if the Court eventually enters a restraining order as to the Joneses' interest in Mega, the Joneses' right of indemnification would be restrained irrespective of the Court's ruling on the issue of New Mexico law. Accordingly, the Court will deny both motions as moot.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' Motions for a *Monsanto* Hearing and Release of Seized Funds [**Docs. 4**] is hereby **GRANTED**, and that Motion of Defendants Shirley A. Jones and Steven L. Jones for Court to Consider the Government's Prior Statements About Mega's Expenses as Admissions **[Doc. 125]** and the Motion of Defendants Shirley A. Jones and Steven L. Jones for Court to Certify Issue to New Mexico Supreme Court **[Doc. 130]** are hereby **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** the Court's Protective Order [**Doc. 24**] is hereby **DISSOLVED IN ITS ENTIRETY**. Specifically, the restraining order is hereby **DISSOLVED** as to all contents of Bank of America bank account numbers 2022434948 and 2022634829. These accounts are no longer encumbered or restricted by order of this Court in any manner.

*/s/ Martha Vázquez*
MARTHA VÁZQUEZ
U. S. DISTRICT COURT JUDGE

Attorney for Plaintiff:
  Mary Higgins
  Paula Burnett

Attorney for Defendants:
  Nancy Hollander
  John Cline
  Louis Stelzner
  Richard Minzner