IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                    No. CR 98-251 MV

SHIRLEY A. JONES, STEVEN
L. JONES, MEGA-UNIVERSAL
OXYGEN AND HOME CARE
SERVICES, INC., *et al.,*

      Defendants.

## MEMORANDUM, OPINION AND ORDER

THIS MATTER comes before the Court on the Motions of Defendants for a Mistrial. The

Court, having reviewed the motions, responses, relevant law and otherwise being fully advised,

finds that the motions are well taken and will be granted.

### Shirley Jones

The due process clause of the Fourteenth Amendment prohibits the criminal prosecution

of a defendant who is not competent to stand trial. *Cooper v. Oklahoma*, 517 U.S. 348, 354

(1996); *Medina v. California*, 505 U.S. 437 (1992); *Drope v. Missouri*, 420 U.S. 162, 171-72

(1975); *Pate v. Robinson*, 383 U.S. 375, 385 (1966).   The test for determining competency is

whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable

degree of rational understanding" and a "rational as well as factual understanding of the

proceedings against him....  It is not enough for the district judge to find that the defendant is

oriented to time and place and has some recollection of events." *Dusky v. United States,* 362

1

U.S. 402, 402 (1960) (*per curiam*).[1]   In federal court, the burden is on Mrs. Jones to prove

incompetence by a preponderance of the evidence.  *See Cooper*, 517 U.S. at 362 (citing 18

U.S.C. § 4241).

Allowing an incompetent defendant to proceed to trial or a conviction to stand while a

defendant was incompetent through much of the trial is a much graver error than to order a retrial

or delay for a possibly malingering defendant.  "While important state interests are unquestionably

at stake, ... the defendant's fundamental right to be tried only while competent outweighs the

state's interest in the efficient operation of its criminal justice system." *Cooper*, 517 U.S. at 367.

The Court's reasoning is worth quoting in detail:

> For the defendant, the consequences of an erroneous determination of competence
> are dire.  Because he lacks the ability to communicate effectively with counsel, he
> may be unable to exercise other "rights deemed essential to a fair trial." *Riggins v.
> Nevada*, 504 U.S. 127, 139 (1992) (KENNEDY, J., concurring in judgment).
> After making the "profound" choice whether to plead guilty, *Godinez v. Moran*,
> 509 U.S. 389, 398 (1993), the defendant who proceeds to trial "will ordinarily
> have to decide whether to waive his 'privilege against compulsory
> self-incrimination,' *Boykin v. Alabama*, 395 U.S. 238, 243 (1969), by taking the
> witness stand; if the option is available, he may have to decide whether to waive
> his 'right to trial by jury,' *id.*; and, in consultation with counsel, he may have to
> decide whether to waive his 'right to confront [his] accusers,' *id.*, by declining to
> cross-examine witnesses for the prosecution." *Id.*
>
> ... By comparison to the defendant's interest, the injury to the State of the opposite
> error--a conclusion that the defendant is incompetent when he is in fact malingering--is
> modest. To be sure, such an error imposes an expense on the state treasury and frustrates
> the State's interest in the prompt disposition of criminal charges. But the error is subject to
> correction in a subsequent proceeding and the State may detain the incompetent defendant

---

[1] The fact that competency of Mrs. Jones was raised after the commencement of the trial is of no
consequence.  "Even when a defendant is competent at the commencement of his trial, a trial court  must always be
alert to circumstances suggesting a change that would render the accused unable to meet the standards of
competence to stand trial." *Drope v. Missouri*, 420 U.S. 162 (1975).  In *Barnett v. Hargett*, 174 F.3d 1128, 1131
(10th Cir. 1999), the jury trial and sentencing were not continuous;  as noted by the Tenth Circuit, the petitioner
achieved competency for his trial in March 1989, was determined to be incompetent thereafter, and was not
sentenced until August 1989 when he regained competency.

for "the reasonable period of time necessary to determine whether there is a substantial probability that he will attain [competence] in the foreseeable future." *Jackson v. Indiana*, 406 U.S. 715, 738 (1972).

*Cooper*, 517 U.S. at 364-65.

The fact that this Court must make a retrospective determination of competency is not problematic. In *Clayton v. Gibson*, 199 F.3d 1162 (10th Cir. 1999), the defendant claimed that it was error for the court to retroactively determine competency, six years after trial. *Id.* at 1168. The Court found no error in the state court's determination that a restrospective competency hearing was feasible. *Id.* at 1169.

The court said that retrospective competency hearings are permissible "whenever a court can conduct a meaningful hearing to evaluate retrospectively the competency of the defendant." *Clayton* at 1169 (citing *Moran v. Godinez*, 57 F.3d 690, 696 (9th Cir.1994); *Drope v. Missouri*, 420 U.S. 162, 180-83 (1975)). The court went to say that a meaningful determination is possible "where the state of the record, together with such additional evidence as may be relevant and available, permits an accurate assessment of the defendant's condition at the time of the original state proceedings." *Id.* (citing *Reynolds v. Norris*, 86 F.3d 796, 802 (8th Cir.1996)).

In *Clayton* the court found that six years was not too long to determine competency. "The passage of time is not an insurmountable obstacle if sufficient contemporaneous information is available." *Clayton*, 199 F.3d at 1169. *See also Barefield v. New Mexico*, 434 F.2d 307, 309 (10th Cir.1970) (finding "mere lapse of time before a competency hearing" does not invalidate findings made as a result of that hearing). In this case, it is not a question of years, but of weeks, to determine if Ms. Jones had been competent during the trial. Additionally, the court has before it contemporaneous medical records that indicate that Ms. Jones was not competent during the

3

trial.  Much of the evidence that the Court has to base the determination that Ms. Jones is not competent at this point is the evidence that dates back through the entirety of the trial.  "[M]edical reports contemporaneous to the time [of trial] greatly increase the chance for an accurate retrospective evaluation of a defendant's competence." *Clayton* at 1169 (citing *Moran*, 57 F.3d at 696).  The only evidence that is not contemporaneous (although it is at the end of a week of testimony) is Dr. Tashjian's actual finding of incompetence.  However, that finding  is based on the possible confluence of etilogies of Ms. Jones' neurosarcoidosis; out of control diabetes and high dosages of Prednisone, all of which have been present, as indicated in her medical records dating back to January 11, 2001, throughout the trial.

Additionally, defense counsel's observations of Ms. Jones' irrational and bizarre behavior dates back to at least January 29, 2001, which was during the second week of testimony. Defense counsel even reported bizarre behavior throughout their dealings with Ms. Jones, but were certain as early as the second week of trial that Ms. Jones was, due to her mental state, unable to assist them in the preparation of their defense. Additionally, on February 5, 2001, the trial was interrupted because Ms. Jones was in danger of going into a diabetic coma. Therefore, there are sufficient contemporaneous medical records for the Court to determine that Ms. Jones was not competent during much of the proceedings.

This Court has already found that Ms. Jones was not competent to proceed with trial on March 6, 2001.  The Court did not at that time feel that it had enough evidence to make a determination as to Ms. Jones competence during the entire course of the trial.  Now, however, there are three significant points that lead this Court to conclude that Ms. Jones was not competent during the course of the trial:  Dr. Tashjian's opinion that Ms. Jones was not

4

competent during the trial; Dr. Taylor's observations of Ms. Jones on February 5, 2001; and the

fact that Ms. Jones' competency has been restored with the monitoring of her Prednisone intake

and blood sugar levels.  Additionally, the Court notes that the standard is the preponderance of

the evidence.  The Government did not present any evidence that Ms. Jones was competent

during the course of the trial.  They merely suggested that Ms. Jones was malingering.  However,

they did not present any definitive evidence on this point.  Their own expert, Dr. Landau, could

not confirm that Ms. Jones was in fact malingering.  Dr. Taylor stated that Ms. Jones' medical

conditions were real and not faked, although he could not state whether her affect on February 5,

2001 was genuine, or whether she was "putting on."  He simply did not make a judgment about

her presentation to him one way or the other.  Therefore, as Ms. Jones has presented ample

credible evidence to suggest incompetency, and the Government has not produced any definitive

evidence to the contrary, this Court finds that Ms. Jones was not competent to assist her attorneys

in her own defense on every day of the trial.


Dr. Tashjian's Opinion

        Dr. Tashjian has opined that Ms. Jones could not have been competent during much of the

trial.  Dr. Tashjian re-evaluted Ms. Jones on April 2, 2001 to determine whether she was

competent to stand trial. He reviewed medical records from her current treating physicians, Drs.

Taylor and Fisher, and conducted a mental status examination.  He found that while Ms. Jones is

still "quite medically ill, she is much less ill than she was at the time of [his] first evaluation."  This

response to treatment, in addition to her and her husband's recount of her clinical state in the last

couple of months, strongly suggested to him that her "Delirium and Organic Brain Syndrome

were present for a number of months, perhaps years, of desultory treatment of the Diabetes and

Sarcoidosis and of self-medication with an extraordinarily dangerous medication, Prednisone."

Dr. Tashjian went on to state that Ms. Jones:

> did not get delirius in one or two days.  The Delirium from which she suffered
> emerged over a period of time and is the result, not only of the excess of
> Prednisone, but of the Diabetes being out of control and possibly the CNS lesion.
> It is characterized by shifting levels of consciousness and cognitive capability, with
> fluctuating capacity to think rationally, to hold a train of thought and to participate
> in a conversation.  At times she may have appeared to have been in focus.  At
> other times she may have appeared to have been out of focus.  Like someone
> intoxicated, she might have appeared inappropriate or silly in demeanor, as if she
> were "putting on" or malingering.  But she was not malingering.  The condition
> she had was real, not faked, not exaggerated for the sake of effect on the
> proceedings at hand.

Dr. Tashjian's Report, 4/4/01, p. 2 (emphasis in original).  In Dr. Tashjian's original report, he

found that Ms. Jones was not competent to stand trial.  He found that she had temporal

disorientation; significant short term memory deficits, that she could not process information or

retain it for short or long term use, that her long term memory was sketchy at best; and that her

cognitive capabilities were fragmented and glaringly impaired, especially for one with her

educational and professional level.  *See* Dr. Tashjian's report, February 24, 2001.


Dr. Taylor's Testimony

In addition to Dr. Tashjian's opinion that Ms. Jones was not competent during the trial,

the Court also heard testimony from Dr. Thomas Taylor, Ms. Jones' current endocrinologist.  Dr.

Taylor saw Ms. Jones on February 5, 2001.  He noted that her affect was obtunded.  She was not

comatose, but she was not fully oriented. She did not respond to him - he had to repeat himself

several times to her.  It seemed as if her mind were somewhere else.  She was not "in contact"

6

with him.  She was halfway answering the questions and the rest of the time she seemed to have great difficulty focusing on the questions he asked.  She relied on others in the room to provide information for her. Her eyes were squinting and hurting her.  Dr. Taylor contrasted Ms. Jones' presentation on February 5, 2001 with Ms. Jones' presentation now.  Now, he testified, Ms. Jones pays attention, is alert, and appears to be aware of their conversation when he is with her.  While she defers to her husband for her insulin, she does not appear to defer to him for  information as she did before.  Dr. Taylor was not willing to make a judgment about Ms. Jones affect.  He stated that a psychiatrist was in the best position to interpret her behavior.  Dr. Tashjian testified after Dr. Taylor, and stated that in his professional opinion, Dr. Taylor saw the same Shirley Jones on February 5, 2001 that Dr. Tashjian saw on February 23, 2001, when he found Ms. Jones to be incompetent.

Dr. Taylor also testified that since Ms. Jones first saw him, which he believed to be in January, she had been taking high levels of Prednisone.  He noted that Ms. Jones' blood sugars have been very high since she has been patient - in the 400 to 700 range.  He also testified that on Ms. Jones had hemoglobin A1Cs of 12, which was consistent with very high blood sugar.


The Change With Medical Treatment

The fact that Ms. Jones' restored competency was directly correlated with a reduction in her Prednisone intake and with medical treatment is significant to the Court, as it was to Dr. Tashjian.  Since this Court declared Ms. Jones incompetent to stand trial on March 5, 2001, Ms. Jones has been seen weekly by her treating physicians.  Dr. Fisher has been reducing her Prednisone levels weekly, and Dr. Taylor has been monitoring her blood sugar levels.  By all

accounts, she is alert, oriented and competent to stand trial.  Dr. Tashjian found that this change

in her mental functioning signified that the etiology was primarily the elevated levels of

Prednisone.  The Court agrees.


Evidence Previously Considered

In addition to the above evidence, the Court considers the evidence presented during the

March 5th competency hearing as relevant to its determination that Ms. Jones was not competent

during all of the proceedings.  The Court already found that Ms. Jones was taking elevated levels

of Prednisone throughout the trial.  The medical records indicate that she was consistently taking

Prednisone at levels of 80-100 mg a day, which was prescribed by Dr. Fisher, as early as January

26, 2001.  Dr. Tashjian's testimony was that she stopped taking 140 milligrams the week of her

examination by Dr. Tashjian, that she stopped taking them on Tuesday, and Friday was the date of

the evaluation, which was February the 23rd.  Dr. Tashjian stated that prolonged use of elevated

levels of Prednisone could cause delirium, which was consistent with his examination of Ms. Jones

on February 23, 2001.  He also stated that he could not be certain of the etiology of her delirium -

that Ms. Jones' elevated blood sugar levels and CNS lesion could also have caused her

impairment.

There was no disagreement that high levels of Prednisone taken over a long period of time

may cause steroid psychosis and a compromise in one's mental functioning.  This was according

to Dr. Taylor and Dr. Tashjian.  Both doctors also stated that elevated blood sugar levels may be

caused by high levels of Prednisone and that that in turn, the increase in blood sugar levels,

especially at the amounts in the medical records and in the testimony, may also impair mental

functioning.

We know that on February 5, 2001, Ms. Jones had an elevated blood sugar level in the 700-800 range.  Trial had to be recessed to allow Ms. Jones to get immediate medical attention and to rest.  Dr. Klepper, the government's own expert, was testifying that day, and confirmed that blood sugar levels in that range approach a diabetic coma.  Dr. Tashjian relayed that when blood sugar levels are that high, approaching a comatose state, a patient will be in and out of consciousness.  He described consciousness as a continuum - a comatose state is at one extreme of the spectrum.  Because Ms. Jones' blood sugar was so high, it is likely that she was in and out of consciousness at this time.  The anecdotal evidence from Steve Jones and Ms. Eckert confirm that Ms. Jones' mental functioning was impaired to this degree.  They both testified to observations of Ms. Jones during the trial, beginning at the end of January and continuing through this Court's recess on February 22, 2001.

Ms. Eckert testified that Ms. Jones was not able to assist her or Mr. Robert in the preparation of her defense.  Ms. Eckert testified that during the last few weeks of trial, she noticed that Ms. Jones seemed zoned out.  There were times when Ms. Jones seemed bright and alert, but others when she simply appeared blank.  During the last several weeks of the trial, Ms. Jones became a hindrance to her defense.  During direct testimony, Ms. Jones made incoherent or incorrect comments to her counsel that distracted them from focusing on the testimony to prepare for cross examination.  Specifically, there were two incidents that stood out to Ms. Eckert that made Ms. Eckert and Mr. Robert realize that Shirley could not be relied upon to assist in her own defense.  The first was on January 31, 2001, when Julie Weinberg, a patient, was testifying.  During her direct testiomony, Ms. Jones told Ms. Eckert that she knew this patient very well. Ms.

9

Jones stated that she delivered oxygen to this woman's home, that Ms. Jones talked with her for a long time.  Ms. Eckert testified that Ms. Jones described the scene in great detail.  On cross examination, Ms. Eckert asked the patient about Ms. Jones, and the patient denied ever seeing Ms. Jones.  On February 5, 2001, Ms. Jones gave similarly unreliable information about a witness. Joyce Brown, a former bookkeeper, was testifying.  Ms. Jones told Ms. Eckert that she had never seen or spoken with this witness before.  The witness, however, testified that she had spoken with Ms. Jones several times.  Finally, during the last week of trial, when defense counsel were discussing Ms. Jones' decision to testify, Ms. Eckert testified that her conduct was irrational.  She changed her mind from minute to minute.  When they attempted to prepare her testimony, Ms. Jones did not appear to have understood the testimony presented during trial.  She could not synthesize the information and respond.  She could not connect the facts with reality.

At the March 5th hearing, Steve Jones testified that Ms. Jones was taking 80-100 mg of Prednisone a day, sometimes up to 140 mg, for the previous month and a half.  He also testified that Ms. Jones' mental functioning has declined during trial.  She has become very forgetful and can no longer remember where anything is in the house.  He stopped asking her for information, whereas before he could always rely on her to know where something was in the house.  She stopped driving and no longer liked to go anywhere by herself.  She stopped talking about current events, not because she did not want to talk about them, but because she no longer had anything to say.  Usually they would have conversations in the car, but during trial, she just wore a blank stare.  He testified that she was tired often. Since trial has started, she has become very angry, and they argue often.  She does not appear to understand the testimony.  She asks Mr. Jones to repeat what the witnesses are saying.  He also testified that he has never seen Ms. Jones manipulate her

blood sugar to get it higher.  She has always been trying to get it down.

The Government's position is that Ms. Jones was malingering, both in her presentation to Drs. Tashjian and Landau during their competency evaluations and in her reporting of the doses of Prednisone she was taking.  However, the medical records substantiate the reporting by Mrs. Jones.  As late as January 26th of this year, the Presbyterian Medical Group records indicate that Mrs. Jones was taking 80 to 100 milligrams of Prednisone.  As to when this started, it appears from the medical records that Ms. Jones started taking Prednisone in the fall of 1996.  It was either in October or November.

It appears that Mrs. Jones started receiving Prednisone in the fall of 1996 because of the diagnoses for acute sarcoidosis.  The medical records indicate that she was started on 60 milligrams, at 20 milligrams three times a day for a short period of time, with the idea that the Prednisone, even back then, be cut back to 40 milligrams a day.  The medical records appear to confirm that Ms. Jones' diabetes is a result of her Prednisone intake. Although Dr. Best indicated in the medical records that although Ms. Jones had a family history of diabetes, she had  no evidence of diabetes or any symptoms of diabetes until she started taking the Prednisone. Dr. Best stated that at levels of 60 milligrams of Prednisone, the patient, who previously did not have diabetes, developed blood sugars at levels of 200 to 400.  In February of 1997 Dr. Best, after a few months of having considered this, indicates in his medical records that the patient does, indeed, have sarcoidosis, non-insulin dependent diabetes, and that there is liver involvement.  She was being placed on Prednisone again at 40 milligrams.

The pattern that has been explained by the defense, that Ms. Jones has a pattern of self medicating, is also documented in the medical records.  The question as to whether she, in fact,

was self medicating during the course of this trial or at least at that time period in which she was given the competency evaluation has a history which dates back at least to May 30th of 1997. On that date, apparently, the patient had an acute onset of blindness in the left eye. She saw her ophthalmologist, Dr. Carlo, who obtained an MRI which revealed a pituitary lesion. The medical records indicate that there was a neurosurgeon consult that was done, and Mrs. Jones was told that it would be advisable for her to consider surgery. The medical records indicate that her reaction to this was to say no to the surgery but to, on her own, increase the levels of Prednisone that she was receiving from ten milligrams to 40 milligrams, according to Dr. Best's notes. He indicates that her visual loss totally reversed itself and that her vision was now normal. There was no surgery that was conducted because of that, and the doctors at that point decided that a biopsy was not in order either. Dr. Best also indicates on July 2, 1997, that increasing the steroid dose from 10 milligrams to 40 milligrams completely reversed the visual defects that the patient had reported.

There is also concern in the medical records at this time is of the effect that the levels of Prednisone would have on blood sugar levels. As of May of 1999, Ms. Jones is taking 60 to 80 milligrams of Prednisone on a daily basis. The medical records note that in October, Ms. Jones was taking five milligrams per day. It is clear that the medical history and the medical records document that Mrs. Jones has been taking what is considered by Dr. Fisher as well as Dr. Tashjian high levels of Prednisone for an extended period of time. The medical records also link the high blood sugar levels to the use of Prednisone. Prior to starting the use of Prednisone, Ms. Jones' medical records and medical history do not indicate any problem with blood sugar levels.

As to the etiology of Ms. Jones' impairments, Dr. Landau, the government's expert

believed he could rule out the diabetes and the CNS lesion as a cause of Ms. Jones' delirium.  But

Dr. Taylor, who spent much more time with Mrs. Jones than Dr. Landau or Dr. Tashjian, in his

letter, indicated that it is hard to separate out the sarcoidosis from the Prednisone intake.  Dr.

Taylor's letter of March 1, 2001, describes Mrs. Jones as a very complicated case.  She has

sarcoid, and it is known to invade the central nervous system.  He indicates that he is used to

seeing people who, because of sarcoid, have had other mental aberrations.  He says he's not an

expert as to the latter.  The use of high-dose steroids can result in steroid psychosis.  She was on

much higher doses than most people that he sees, and he says that a steroid psychosis can result

from even lower doses than what he sees in this patient.  He talks about steroids having been

known to cause steroid psychosis, but he says in this case, coupled with the central nervous

system involvement of the sarcoid, it would be tough to sort out which is affecting her.  As a

result, Dr. Taylor is relying upon both medical conditions as contributors to the limitations in

mental status that the psychiatrists found or observed.

Dr. Tashjian also testified that the blood sugar levels have an impact on the limitation of

mental status.  He stated that as the blood sugar level increases, consciousness moves along a

continuum, moving toward a diabetic coma.  At levels of 700 to 800 milligrams, that were

reported to him, are blood sugar levels that would significantly impair her mental alertness.   The

Court finds that the records and the history present in this case clearly indicate that Ms. Jones was

taking Prednisone at what is considered to be high dosage for what is obviously a very long

period of time dating back until 1996.

Therefore, with all of that evidence in mind, the Court finds that Ms. Jones was not

competent during every day of the proceedings.  As a result, the Court is compelled to grant a

mistrial as to Ms. Jones.

**<u>Steven Jones</u>**

The decision to deny a motion for a mistrial is within the discretion of the trial judge.  *See United States v. Massey*, 48 F.3d 1560, 1569 (10th Cir.1995).  The Tenth Circuit will reverse the district court only if they find there was a clear error of judgment or if the court exceeded the range of permissible choices. *See United States v. Novak*, 918 F.2d 107, 108-09 (10th Cir.1990).

The Government cites *Massey* as support that a mistrial would be improper.  *Massey* does not settle the matter for the court, however.  In *Massey*, the codefendant pled guilty during the trial.  The Tenth Circuit held that the trial court did not err in failing to grant a mistrial.  The court stated that when a coconspirator pleads guilty, "the district court must instruct the jury, however, that a guilty plea by a coconspirator may not be used as substantive evidence of a defendant's guilt."  *Massey* at 1569 (citing *United States v. Davis*, 965 F.2d 804, 815-16 (10th Cir.1992)). The court went on to state that "a judge may inform a jury that a co-defendant has pled guilty during the midst of a trial, so long as the jury is instructed not to use the plea as evidence of his or her codefendants' guilt."  *Id.* (citing *United States v. Baez*, 703 F.2d 453, 455 (10th Cir. 1983); *United States v. Earley*, 482 F.2d 53, 58-59 (10th Cir.), cert. denied, 414 U.S. 1111, 94 S.Ct. 841, 38 L.Ed.2d 738 (1973). *See also United States v. Bavers*, 787 F.2d 1022, 1028-29 (6th Cir.1985) (no need to call a mistrial when codefendant changed plea and testified against other codefendant)).

*Massey* and the cases it cites are not directly applicable here.  They held that evidence of a guilty plea is admissible not as substantive evidence of a defendant's guilt, *see United States v.*

14

*Baez*, 703 F.2d 453, 455 (10th Cir.1983), but "a witness' guilty plea is received for the very limited purpose of determining witness credibility and is not to be considered as implying the guilt of the defendant." *United States v. Davis*, 965 F.2d 804, 815-16 (10th Cir. 1992) (citing *United States v. Davis*, 766 F.2d 1452, 1456 (10th Cir. 1985)).   Therefore, the guilty plea was before the jury because the codefendant testified against the defendant, and the plea was introduced to undermine his credibility.  That is not the situation presented with here.

     *Massey* and the line of cases it cites do not lend support for the Government's position. In fact, they lend support for Steven Jones' position.  The fact that there is no error in allowing a codefendant to plead guilty during the trial, and even perhaps testify against the remaining defendant, is a very different situation from if there is *no* codefendant, one who is much more culpable, at the end of trial.  If Shirley Jones had pled guilty part way through the trial, Steven Jones would not be sitting before the jury alone. Shirley would have already taken responsibility for her part in the fraud charges.

     Moreover, *Massey* dealt with reviewing a *denial* of a mistrial.  It simply stands for the unremarkable position that it was not error for the trial court to deny a mistrial.  It does not instruct this court on the factors to consider in granting a mistrial.

     The Court does not have to determine that it would have severed the defendants in order to grant a mistrial, although it is a starting point.  It is not the ending point, however, because Steven Jones is in the terrible position of not having a severance, being the least culpable defendant, being the only one to face the jury at the end of the trial after weeks of evidence that focused mostly on Ms. Jones.  This combination of factors is what prejudices him.

     However, the Government is incorrect in stating that a severance would not have been

granted had Mr. Jones so moved.  In determining whether to sever trials of properly joined

defendants, "the trial court must balance two competing interests by weighing the prejudice to a

particular defendant caused by the joinder against considerations of economy and expedition in

judicial administration." *United States v. Sanders*, 929 F.2d 1466, 1469 (10th Cir. 1991) (citing

*United States v. Pack*, 773 F.2d 261, 267 (10th Cir.1985)).  A defendant wishing to obtain

severance must show actual prejudice at trial will result from failure to sever the trials.  *Id.* (citing

*United States v. Hack*, 782 F.2d 862, 870 (10th Cir. 1985)).  Rule 14 leaves the determination of

risk of prejudice and any remedy for such prejudice to the sound discretion of the district court.

*United States v. Morales*, 108 F.3d 1213, 1220 (10th Cir. 1997) (citing *Zafiro* at 541).  The court

in *Morales* went on to say:

> Such a risk might occur when evidence that the jury should not consider against a
> defendant and that would not be admissible if a defendant were tried alone is
> admitted against a codefendant. For example, evidence of a codefendant's
> wrongdoing in some circumstances erroneously could lead a jury to conclude that
> a defendant was guilty. When many defendants are tried together in a complex
> case and they have markedly different degrees of culpability, this risk of prejudice
> is heightened. Evidence that is probative of a defendant's guilt but technically
> admissible only against a codefendant also might present a risk of prejudice.

*Morales* at 1219-20.  A risk of prejudice has occurred in this case because evidence of Shirley's

wrongdoing has been admitted that would not otherwise have been admitted against Steven

Jones.  Although the Government dismisses the evidence that related to the money laundering, tax

fraud and obstruction counts as not relevant to the wire fraud counts (where Steven Jones is

charged), such evidence has infected Mr. Jones' case.  The Government must establish intent.

The evidence relating to the money laundering, tax fraud, and obstruction charges against Shirley

was the most incriminating evidence they presented on intent.  Steve Jones' intent, the

Government's theory has always been, is that it is derivative of Shirley's.  Whatever Shirley knew and intended, Steve *must have* known and intended also, because he lived in the same house and was her husband.

Additionally, it is arguable whether the evidence that was admitted against Shirley would have come in had she not been a codefendant.  While most of Shirley's statements that came in statements of a party opponent could have come as statements of a coconspirator, nonetheless, there would have been serious questions of relevance to Steven Jones.  The Government would have had to have established a much more sufficient foundation to the testimony of the witnesses and the exhibits as to Steve Jones. It is likely that in many of those instances, they would not have been able to do so.  For example, had Shirley not been present in the case with Steve, the evidence about her telling employees to destroy documents may not have come in.  It was relevant to the obstruction charges, but the Government will also presumably use it to show Shirley's knowledge of the fraud.  Their only link to Steve Jones was that he was present during one of the meetings where Shirley told the employees about the investigation.  This would not have been sufficient to introduce Shirley's statements against Steve in a severed trial.

The Government's argument as to *Sanders* fails in the same way its argument as to *Massey* fails.  While it is true that in *Sanders* the Tenth Circuit held it was not error for a wife to have been tried jointly with her husband, that decision simply stands for the proposition that the trial judge did not abuse his discretion in denying severance.  However, it does not mandate joinder.  Moreover, *Sanders* does not address the situation of joinder of a less culpable defendant, and then absence of the more culpable defendant during the jury's deliberations.  In this case, Mr. Jones is in the worst possible situation - after having been joined with a more culpable defendant,

17

he is now left to face the jury alone.  While curative instructions are encouraged, a mistrial should be granted where instructions cannot cure the prejudice.  This is one of those cases.

The Government also cites *Zafiro v. United States*, 506 U.S. 534, 539 (1993).  There the Supreme Court held that the issue of severance was committed to the sound discretion of the trial court, and that the trial court did not err in declining to grant severance despite the fact that the defenses were mutually antagonistic.  Again, this case merely states that the district court did not abuse its discretion in denying severance.  It does not mandate joinder.  However, the case does give authority for, and even encourages, the trial court to award severance when the defenses of potential codefendants would be mutually antagonistic.  "In interpreting Rule 14, the Courts of Appeals frequently have expressed the view that 'mutually antagonistic' or 'irreconcilable' defenses may be so prejudicial in some circumstances as to mandate severance."  *Id.* at 539.  That is precisely Steven Jones' argument:  he did not move for severance because he assumed his defense would not be mutually antagonistic.  However, with the change of events, he would have pursued an antagonistic defense, and would have been entitled to severance.

In *United States v. Smith*, 788 F.2d 663, 668 (10th Cir. 1986), the Tenth Circuit laid forth the standard for showing an irreconciliable defense:

> Neither a mere claim of conflicting defense theories nor an attempt by one defendant to cast blame on the other is adequate for a showing of actual prejudice which requires a granting of separate trials. *United States v. McClure*, 734 F.2d 484, 488 (10th Cir.1984). We have, however, suggested that "irreconcilable defenses may require that defendants be tried separately." *Id.*, (emphasis in original). To sustain a claim of error under this theory, a defendant must make a factual demonstration, not an abstract allegation, that "the acceptance of one party's defense would tend to preclude the acquittal of other," or that "(c)onversely, such a showing would seemingly require that the guilt of one defendant tends to establish the innocence of the other." *Id.*, n. 1.

18

Severance is required by Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. *United States v. Hardwell*, 80 F.3d 1471, 1487 (10th Cir. 1996) (citing *Zafiro v. United States*, 506 U.S. 534, 539 (1993)). *Zafiro* recognized that evidence admissible only against some co-defendants can create the risk of an unfair trial for the other co-defendants. *See* 506 U.S. at 539. In *Hardwell*, the defendant argued that he was prejudiced by the "spillover effect" of prior crimes evidence that was admitted against his co- defendants. The Court stated that limiting instructions are ordinarily sufficient to cure potential prejudice. *Id.* (citing *Zafiro*, 506 U.S. at 540-41). *Hardwell* is distinguishable from this case, however, because the Tenth Circuit found that the evidence against the defendant "was sufficiently strong to dispel the argument that he was convicted only because of the spillover effect of evidence admitted against his co-defendants." *Id.* at 1487. This is not the case here.

Mr. Jones has shown prejudice. Steve Jones argues that most of the evidence that was presented during the trial would not have been admitted had Shirley Jones not been present. The Government counters that the only evidence that would not have been admitted was the evidence that related to the money laundering, the tax fraud and the obstruction counts. The Government is incorrect. Many of the witnesses who testified gave information only about Shirley Jones' involvement in the business. The most they saw of Steve was that he was present. No one testified that they talked about business with Steve Jones. The only references to Steve Jones' involvement with the business was the fish tanks, filling out HCFA 1500s, and training in the computer program. The Government's allegations as to Steve Jones' involvement in the enterprise are derivative of Shirley's. Steven Jones objected on relevance grounds to much of the

witness' testimony and exhibits that indicated that only Shirley Jones was involved with either the witness or the document.  This evidence is only peripherally related to Mr. Jones, as he was vice president of the corporation.  However, most of the evidence admitted against Mr. Jones fails to show his involvement at all; it merely shows the operation of Mega.  The Government seeks to show Mr. Jones' involvement in the alleged fraud through the three facts cited above, in addition to the fact that he lived with Shirley Jones and had business records in his office; therefore he must have known.  The Court finds that curative instructions are not sufficient, and grants a mistrial as to Mr. Jones.

IT IS THEREFORE **ORDERED** Defendant Shirley Jones' Motion for a Mistrial is hereby **granted**; and Defendant Steve Jones' Motion for a Mistrial is also **granted**.

_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE

Attorneys for Government
Mary Higgins
Edwin Winstead
Bob Baca

Attorneys for Shirley Jones
Marc Robert
Hope Eckert

Attorneys for Steve Jones
David Plotsky
Hank Farrah